

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

UNITED STATES OF AMERICA

v.                                    Criminal No. 3:15-cr-100

DELVONTE E. HARRIS,

          Defendant.

### MEMORANDUM OPINION

This matter is before the Court on Defendant Delvonte E. Harris' ("Harris") Motion to Suppress Statements, titled SUPPLEMENT TO DEFENDANT'S RESPONSE TO GOVERNMENT'S NOTICE OF INTENT TO INTRODUCE ALLEGED 404(b) EVIDENCE.[1] (ECF No. 29). For the reasons set forth herein, Defendant's motion will be denied.

### BACKGROUND

**A. Factual Background**

On September 6, 2014, at approximately 8:30 p.m., Officers Robert Langston and Nicholas Caesar of the Richmond City Police Department heard gunshots in the Midlothian Village Apartment Complex ("Midlothian Village"). (Government's Motion in Limine

---

[1] Although this motion was filed as a "supplement" to Harris' previous response to the Government's Motion in Limine and Notice of Intent to Introduce Evidence under FRE 404(b) (ECF No. 22), the supplement "requested" that the Court suppress the statements sought to be introduced by the Government on the grounds that the statements were made in violation of Harris' rights pursuant to <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). Therefore, the Court treats Harris' "supplement" as a motion to suppress.

and Notice of Intent to Introduce Evidence under FRE 404(b) ("Gov. Mot.", ECF No. 22) at 2). The officers had been patrolling the Midlothian Village area in response to reports of a nearby shooting approximately two and a half hours earlier. Id. Responding toward the sound of the gunshots, the officers observed an orange Dodge Avenger speeding and running through a stop sign, and initiated a traffic stop. Id. Upon approaching the vehicle, the officers observed Harris moving furtively in the front seat, and removed him from the car, at which time they discovered he had been sitting on a Ruger .40 caliber semiautomatic handgun. Id. Later, police also recovered a Glock 9mm with an extended magazine from under Harris' seat. Id.

Shortly after 8:30 p.m., the officers arrested Harris, and, noticing that Harris' ankle appeared to be severely injured, immediately transported him to the Medical College of Virginia Hospital ("MCV") for medical treatment. Around 12:30 a.m., the local magistrate came to MCV[2] and served three arrest warrants on Harris relating to the two firearms found in the vehicle. (Supplemental Brief in Support of Defendant's Motion to Suppress ("Def. Supp. Br.", ECF No. 37) at 2). Pursuant to the warrants,

---

[2] This procedure, known as a mittimus, is used when an arrestee is physically unable to appear before the local magistrate. In such cases, the magistrate serves the warrants on the arrestee wherever the arrestee is being held (most commonly, as in this case, a hospital). Tr. at 25:12-16.

2

Harris was transferred to the custody of the Richmond City Sheriff's Department, and a Sheriff's deputy was assigned to guard his room.  (Transcript of Nov. 2, 2015 Hrg. ("Tr.", ECF No. 36) at 16:4-13).  For medical reasons, the rails on Harris' hospital bed were raised, and his leg was placed in a cast and secured to an elevating mechanism.  Id. at 17:7-17.  However, the record does not disclose whether the Sheriff's deputy placed any additional restraints on Harris when he was transferred to the Sheriff's custody.

Sometime after 8:00 a.m. the next morning, Sergeant Wayne Skinner ("Skinner") and Detective Amira Sleem ("Sleem") of the Richmond Police Department's Homicide Division visited Harris in the hospital to talk with Harris about an upcoming robbery trial in which Harris was to be a witness.  Id. at 15:22-26.  The officers also hoped that Harris would be able to provide them with information about the shooting that had occurred in Midlothian Village approximately two hours before his arrest. Id. at 14:18-15:1.  Before speaking with Harris, Skinner asked the Sheriff's deputy guarding Harris to step out of the room, so that the officers' conversation with Harris would not "get back to the jail."  Id. at 16:16-23.

During the interview, the officers, dressed in plain clothes, stood at the foot of Harris' bed, where Harris lay with a cast on his injured leg.  Id. at 17:9-20.  Both officers were

3

armed, but Skinner testified that his firearm was covered by his coat. Id. at 18:9-16. Neither officer unholstered a firearm during the interview. Id. Skinner could not recall whether Harris was handcuffed to the bed, though he admitted it was "possible." Id. at 30:18-31:5. Skinner also could not recall whether the door to the room was open or shut during the interview, but thought that he "easily could have" shut the door after asking the Sheriff's deputy to leave. Id. at 31:14-16. The interview lasted approximately twenty to thirty minutes, and Skinner described the tone of the discussion as "conversational" and "not heated," but "not friendly." Id. at 19:8-20:5. At no time before or during the interview did the officers advise Harris of the rights specified in Miranda v. Arizona, 384 U.S. 436 (1966). Id. at 24:1-4.

The officers began their questioning by asking Harris if he could "shed some light" on the circumstances surrounding the shooting in Midlothian Village that had occurred about two hours before Harris was arrested. Id. at 14:16-15:1. Skinner stated that he did not approach Harris as a suspect in that shooting, but thought that he may have been a victim. Id. Harris readily confirmed that "he and the group he was with were being shot at," but did not disclose the identity of the shooter. Id. at 22:2-10. Next, Skinner asked Harris to confirm that he would be willing to testify in an upcoming trial as the victim of a

4

robbery and shooting that had occurred in February 2014. Id. at 15:19-16:3.

The conversation then returned to the events that had occurred in Midlothian Village at 6 p.m. the previous evening. When Harris expressed hesitance to discuss his involvement in the earlier shooting, Skinner disclosed to Harris that there was a video recording of Harris walking through a courtyard in Midlothian Village carrying a firearm immediately prior to the earlier shooting. Id. at 20:6-22 ("And then I said, well, I have you on videotape walking across the yard with a gun. I'm just curious as to why you were doing it."). Harris at first refused to admit that he had been carrying a firearm, and asked the officers to describe what he had been wearing in the video, to which Skinner replied, "it doesn't work that way." Id. at 38:7-16. When pressed, however, Harris soon admitted that he had been carrying a Glock 9mm with an extended magazine in Midlothian Village the prior evening, and that he carried the weapon "for protection," because "eight to ten people" were "after him" as a result of his agreement to testify in the upcoming robbery trial. Id. at 20:6-21:2. Harris also expressed concern for the safety of his girlfriend and her daughter, and asked the officers to help remove them from Midlothian Village. Id. at 22:19-24:1.

## B. Procedural History

On June 2, 2015, Harris was indicted for possession of a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1). The original indictment charged Harris with possession of only the Ruger .40 caliber handgun that was found under his buttocks at the time of his arrest. (ECF No. 1). On October 21, 2015, the United States filed a motion seeking to introduce Harris' statements in his interview with Skinner and Sleem at trial pursuant to Fed. R. Evid. 404(b). (ECF No. 22). In response, Harris filed the pending motion to suppress. (ECF No. 29). The Court held a hearing on both motions on November 2, 2015.

Following the hearing, the Court ordered the parties to provide supplemental briefing on two issues: first, whether Harris was "in custody" for Miranda purposes during the September 7, interview, in light of the Supreme Court's decision in Howes v. Fields, 132 S. Ct. 1181 (2012); and second, whether the questioning constituted "interrogation" triggering Harris' Miranda rights. (ECF No. 35). In the interim, the United States filed a Superseding Indictment (ECF No. 38) charging Harris with the possession of the Glock 9mm with an extended magazine that was found under his seat at the time of the arrest, in addition to the firearm initially charged. Following

6

the supplemental briefing, the Court heard oral argument on December 3, 2015, and the matter is now ripe for decision.

## DISCUSSION

### A. Legal Background

It is well-established that persons subjected to custodial interrogation are entitled to the safeguards prescribed by Miranda. A suspect interrogated while in police custody "'must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" Berkemer v. McCarty, 468 U.S. 420, 429 (1984) (quoting Miranda, 384 U.S. at 444)). However, this standard, while easily stated, is often difficult to apply. Oregon v. Elstad, 470 U.S. 298, 309 (1985) (noting that the "task of defining 'custody' is a slippery one.").

"'Custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." Howes v. Fields, 132 S. Ct. 1181, 1189 (2012). To determine whether a person was in Miranda custody, the Supreme Court has asked whether "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." New York v. Quarles, 467 U.S. 649, 655 (1984) (internal citation omitted). "[W]hether a suspect is 'in custody' is an objective inquiry," such that the actual,

7

subjective beliefs of the defendant and interviewing officers are irrelevant. J.D.B. v. N. Carolina, 131 S. Ct. 2394, 2402 (2011).

To determine whether there was a "restraint on freedom of movement of the degree associated with a formal arrest," a court must first ascertain whether, in light of the totality of the circumstances, "a 'reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave.'" Howes, 132 S. Ct. at 1189 (internal quotation marks and citations omitted). "Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." Id. (internal citations omitted).

The Supreme Court has noted that "[t]his test, no doubt, is satisfied by all forms of incarceration." Maryland v. Shatzer, 559 U.S. 98, 112 (2010); see also United States v. Conley, 779 F.2d 970, 973 (4th Cir. 1985) (observing that "[a] rational inmate will always accurately perceive that his ultimate freedom of absolutely restrained and that he is never at liberty to leave an interview conducted by prison or other government officials."). However, the Court has recently emphasized that the freedom of movement inquiry is but the "initial step" in the Miranda custody analysis, because not all constraints on a

8

person's movement necessarily amount to a custodial environment for purposes of Miranda. Howes, 132 S. Ct. at 1189-90.

Once a court finds that a reasonable person in the suspect's position would not have felt free to end the interview, the court must ask "the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." Id. "This further requirement recognizes that situations exist where a person is detained but not in Miranda custody because 'such detention does not sufficiently impair [the detained person's] free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights.'" United States v. Couch, 2013 WL 6095512, at *9 (E.D. Ky. Nov. 20, 2013) (citing Howes, 132 S. Ct. at 1189-90) (internal citation omitted)).

Especially when dealing with a case outside the Miranda paradigm, it is essential to keep in mind that "the freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody." Shatzer, 559 U.S. at 130. "That is, custody under Miranda means a suspect is not free to go away, but a suspect's lack of freedom to go away does not necessarily mean that questioning is custodial interrogation for purposes of Miranda." United States v. Ellison, 632 F.3d 727, 729 (1st Cir. 2010).

In Howes, a Michigan prisoner, Randall Fields, was escorted by a corrections officer to a conference room in which he was questioned by two Sheriff's deputies about criminal activity he had allegedly engaged in before coming to prison. Fields was questioned for between five and seven hours, and was at no time given Miranda warnings or advised that he did not have to speak with the deputies. Fields was told more than once that he was free to leave and return to his cell. The deputies were armed, but Fields remained free of restraints. Several times during the interview Fields stated that he no longer wanted to talk to the deputies, but he did not ask to go back to his cell. After Fields eventually confessed and the interview concluded, he had to wait an additional twenty minutes for an escort before returning to his cell well after the time when he generally went to bed.

Under these facts, applying the two-part analysis set forth above, the Court held that "imprisonment alone is not enough to create a custodial situation within the meaning of Miranda." 132 S. Ct. at 1190; see also Conley, 779 F.2d 970. The Court reasoned that questioning an incarcerated person does not generally "involve the shock that very often accompanies arrest," that "when a prisoner is questioned, he knows that when the questioning ceases, he will remain under confinement," that a prisoner "is unlikely to be lured into speaking by a longing

for prompt release," and that a prisoner knows his questioners "probably lack the authority to affect the duration of his sentence." Id. at 1190-1191. In sum, the Court held that "[w]hen a prisoner is questioned, the determination of custody should focus on all features of the interrogation. These include the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted." Id. at 1192. The Court stressed that "'[f]idelity to the doctrine announced in Miranda requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated.'" Id. at 1192 (quoting Berkemer, 468 U.S. at 437).

### B. Analysis

The primary issue in this case is whether Harris was "in custody" for Miranda purposes at the time of his interview at MCV with Skinner and Sleem. The Government argues that Harris was not "in custody" for Miranda purposes at the time of the interview because, taking into account "all of the circumstances surrounding the questioning," the environment of the interview lacked the "inherently coercive pressures" that trigger Miranda concerns. For the reasons stated below, the Court agrees that Harris was not "in custody" for Miranda purposes at the time of the interview, and therefore not entitled to Miranda

11

warnings.    Accordingly, Harris' motion to suppress will be denied.

As a threshold matter, the rule, announced in Shatzer and clarified in Howes, that incarceration does not necessarily constitute Miranda custody, applies to Harris, a pre-trial detainee.    Admittedly, as Harris points out, the language of Howes demonstrates that the Supreme Court clearly envisioned a "prisoner" as a person who has been "convicted and sentenced." 132 S. Ct. at 1191.    Additionally, the record provides little insight into how the rationales articulated by the Court in Howes apply to the facts presented here.    That is, it is unclear from the record whether "the shock that generally accompanies arrest" had worn off in the twelve hours that elapsed between Harris' arrest and his questioning, or whether Harris thought that Skinner or Sleem "had the authority to affect the duration of his sentence."  Id. at 1191-92.

Nevertheless, the reasoning of other courts that have addressed this issue is helpful here.    Those courts have unanimously held that, although Shatzer and Howes leave open the question of "whether the pressures identified in Miranda are necessarily brought to bear on someone who is incarcerated before trial and then interviewed about circumstances distinct from the pending charges," the distinction between pre-conviction custody and post-conviction custody is not a

12

dispositive one. Ellison, 632 F.3d at 730. Rather, the custody determination ultimately turns on whether the totality of the circumstances reflects the atmosphere of coercion that animates Miranda concerns. See id.; People v. Elliott, 494 Mich. 292, 294-296 (2013); State v. Odell, 293 P.3d 168 (Kan. Ct. App. 2013) (examining Howes and finding the fact that the defendant was detained before trial, rather than after sentencing, "not a material distinction"); People v. Armstrong, 2012 WL 7010037, at *3 (Ill. App. Ct. Aug. 7, 2012); People v. Macklem, 57 Cal. Rptr. 3d 237, 246-255 (Cal. Ct. App. 2007), cert. denied, 128 S. Ct. 1221 (2008).

This conclusion flows inevitably from the Supreme Court's repeated admonitions that "the purposes of the safeguards prescribed by Miranda are to ensure that the police do not coerce or trick captive suspects into confessing, [and] to relieve the 'inherently compelling pressures' generated by the custodial setting itself, 'which work to undermine the individual's will to resist." Berkemer, 468 U.S. at 433 (internal citations omitted). The Supreme Court has emphasized that courts must enforce Miranda "strictly," but "only in those types of situations in which the concerns that powered the decision are implicated." Id. at 440 (internal citations omitted); see also Howes, 132 S. Ct. at 1192; Shatzer, 559 U.S. at 112.

13

As the Supreme Court recently reiterated in Shatzer, Miranda's primary concern is the "psychological pressures 'which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely,'" which are created by "incommunicado interrogation" in a "police-dominated atmosphere." 559 U.S. at 103 (quoting Miranda, 384 U.S. at 456-457, 467). Miranda warnings are an effort to mitigate these psychological pressures; therefore, logically, where the pressures are absent, Miranda warnings are not required. All of the Supreme Court's Miranda jurisprudence reflects the primacy of this core principle. See, e.g., Shatzer, 559 U.S. 98 (holding that, although "all forms of incarceration" undoubtedly restrain a person's freedom of movement to the degree of a formal arrest, incarceration does not necessarily "create the coercive pressures identified in Miranda); Illinois v. Perkins, 496 U.S. 292, 296 (1990) (holding that a prisoner's questioning by undercover law enforcement did not require Miranda warnings because "the essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate"); Berkemer, 468 U.S. 420 (holding that a traffic stop, albeit physically restrictive, is not Miranda custody because it does not "exert[] on a detained person pressures that sufficiently impair his free exercise of

14

his privilege against self-incrimination to require that he be warned of his constitutional rights."). Therefore, as one commentator summarized, "'Miranda's definition of custody reflects a concern more with coercive forces that may affect interactions between a suspect and an interrogating official, and less with the fact that a person's ability to select his activities and routine is greatly limited[.]'" Macklem, 57 Cal. Rptr. 3d at 249 (quoting Laurie Magid, Questioning the Question-Proof Inmate: Defining Miranda Custody for Incarcerated Suspects, 58 Ohio St. L.J. 883, 933 (1997)).

For these reasons, Justice Souter, sitting by designation after his retirement from the Supreme Court, held in Ellison that, although "the condition of someone being held while awaiting trial, like [the defendant], is not exactly the same as the convict's position," a pre-trial detainee is not in custody where there is no indication in the record that the circumstances of the interview "create the atmosphere of coercion subject to Miranda concern." Ellison, 632 F.3d at 730. The previously cited principles lead the Court to agree with Ellison (and, for that matter, every court to have decided the issue since Shatzer) that a detainee's legal status alone cannot resolve whether an interrogation is custodial within the meaning of Miranda. Indeed, a contrary holding would create exactly the sort of per se rule that the Supreme Court has repeatedly

15

rejected in this context.    See, e.g., Howes, 132 S. Ct. at 1188-1189.    Instead,  the  analysis  must  focus  on  whether  the circumstances surrounding law enforcement questioning evince the coercive  atmospheric  pressures  that  animated  the  Miranda decision.

There is no dispute that Harris "was absolutely not free to leave" the hospital room.    Tr. at 25:24.    Thus, the key inquiry is  "whether  the  relevant  environment  presents  the  same inherently  coercive  pressures  as  the  type  of  station  house questioning at issue in Miranda."    Howes, 132 S. Ct. at 1190. Although the Supreme Court has not elaborated on how courts should approach this part of the custody analysis, it seems logical that the same factors the Court described as relevant to ascertaining  how  a  reasonable  detainee  would  perceive  his freedom  of  movement--"the  location  of  the  questioning,  its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning"--must also  inform  the  determination  of  whether  the  environment  of Harris' interview was "inherently coercive."    Howes, 132 S. Ct. at 1189 (internal citations and quotation marks omitted).

Some of the facts presented here have been found relevant to a finding of Miranda custody in other cases.    For example, Skinner and Sleem never represented to Harris that he was free

to terminate the interview or to refuse to answer their questions. Furthermore, the parties do not dispute that a Sheriff's deputy was assigned to guard Harris, which further restricted Harris' movement and increased the law enforcement presence.

However, considering the totality of the circumstances, and applying the factors discussed above to the facts of this case, the record here shows that the coercive psychological pressures animating Miranda are entirely absent here. First, the location of the interview, the hospital room, provided a neutral and non-threatening atmosphere. Moreover, Harris was in the hospital for medical treatment, and not for purposes of interrogation. Harris had been placed in the general population area of the hospital, and was not in the "lockdown" unit. Second, the duration of the questioning was quite short; the interview lasted only approximately twenty to thirty minutes.

Third, the statements made during the interview contain no indication that either officer threatened Harris. Nor is there any evidence that the officers otherwise attempted to intimidate or deceive him. Furthermore, the majority of the interview concerned Harris' involvement in incidents as to which he was potentially a witness or a victim, and Skinner's interest in these incidents was unrelated to any alleged criminal conduct committed by Harris. Harris, "to [Skinner], was not a suspect

17

in anything at that time." (Tr. at 15:5-6). Indeed, Skinner stated that he was not aware of the details of Harris' arrest on the preceding evening and did not broach that topic with Harris at all. Id. at 33:23-34:14. According to the record, Harris seemed calm, lucid, and willing to talk to the officers; he did not seek to end the interview or ask the officers to leave. Id. at 17:18-24; 19:3-7. The tone of the discussion was "conversational" and "not heated." Although the officers never told Harris that he was free to refuse to answer their questions, they likewise never told him he was required to do so. Id. at 19:2-7.

It is undisputed that neither Skinner nor Sleem ever told Harris that he was free to leave or that he was not under arrest, but this fact has no impact on the analysis in this case, because all parties present knew that Harris was in pre-trial custody and therefore not free to leave. Indeed, any statement to this effect on the part of the officers would have been entirely meaningless, because not only was Harris confined to the hospital room by the presence of the Sheriff's deputy, but his injuries physically prevented him from getting out of bed. For these same reasons, the fact that Harris was not released at the end of the questioning is not probative in this case; both Harris and the officers accurately perceived that Harris would remain in the hospital and in the custody of the

Sheriff's deputy following the interview, regardless of the substance of the conversation.

Fourth, it is clear that the physical restraint on Harris was largely a result of his medical condition, rather than his legal circumstances. As the Fourth Circuit has noted, it is important "to separate the restraints on [the defendant's] freedom arising from police interrogation and those incident to his background circumstances." United States v. Jamison, 509 F.3d 623, 629 (4th Cir. 2007). In particular, "to the extent [the defendant] felt constrained by his injuries or the medical exigencies they created," those constraints do not enter the Miranda analysis. Id. Skinner testified that Harris lay in bed with a cast on his elevated injured leg throughout the interview, and the rails of the hospital bed were raised to prevent Harris from inadvertently falling out of bed and injuring himself. However, the record does not show that Harris was handcuffed or subject to any additional physical restraints either before, during, or after the interview. Therefore, although Harris was tethered to his hospital bed and was physically unable to get up, his restraints were "routine treatment" for someone in Harris' medical condition, Jamison, 509 F.3d at 629, and therefore neither add to nor detract from the coerciveness of the interview.

Furthermore, only two law enforcement officers were present during the interview. The officers were not in uniform, and they did not show their weapons or touch Harris. Cf. United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006) (noting that "whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled" were factors in the custody analysis) (citation and internal quotation marks omitted). Thus, considering the totality of the circumstances, we see nothing in the facts of this case that would be likely to create the atmosphere of coercion subject to Miranda concerns.

Harris concedes that, throughout the majority of the interview, the atmosphere in the hospital room was neither "coercive" nor "police-dominated," and therefore non-custodial within the meaning of Miranda. However, Harris contends that this fact changed as soon as Skinner and Sleem began questioning him regarding the video of the man they thought was Harris walking through Midlothian Village carrying a firearm the previous afternoon. Harris asserts that this line of questioning changed the "tone" of the interview, and, as a result, the interrogation became "custodial" at that time within the meaning of Miranda. However, there is no evidence to that effect. Harris also points out that Skinner knew that Harris was a convicted felon, and that he had been arrested on firearm

charges the previous day. Therefore, according to Harris, Skinner presumably knew that Harris' possession of a firearm would constitute criminal activity. From this, Harris concludes that, although Miranda warnings were not initially required, he should have received Miranda warnings at the moment the conversation turned to the topic of the video.

Even assuming that the record contained evidence that the "tone" of the interview changed, that fact alone is not enough to render the otherwise non-coercive atmosphere coercive within the meaning of Miranda. Harris fails to cite any legal authority for the proposition that a decidedly non-coercive atmosphere automatically becomes a custodial and "police-dominated" environment for Miranda purposes the moment conversation turns to an event that might involve criminal conduct on the part of the defendant. Nor could he, because this argument completely contradicts the principle that the custody determination depends on the all of the factual circumstances surrounding an interrogation, considered in their totality; no single factor is dispositive. See, e.g., United States v. Graves, 545 F. App'x 230, 236-37 (4th Cir. 2013).

Admittedly, any conversation between law enforcement and a possible suspect is inherently more coercive than conversation with a potential victim or a witness. See Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (observing that "[a]ny interview of one

21

suspected by a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime."). However, if that fact alone were sufficient to render an environment custodial for Miranda purposes, essentially any interrogation situation would be custodial. To the contrary, the Supreme Court has repeatedly refused to adopt per se rules in this context and has declined to allow any one factor to control the custody analysis. Thus, considered in light of the overwhelmingly non-coercive circumstances discussed above, even if the tone of the interview took an adversarial turn when Skinner confronted Harris about his possession of a firearm the previous day, that would not create a custodial environment for purposes of Miranda.

For the foregoing reasons, Harris was not "in custody" within the meaning of Miranda at the time of his interview with Skinner and Sleem at MCV.[3] Accordingly, the officers did not err in failing to read Harris the Miranda warnings.

---

[3] Because the Court finds that Harris was not "in custody" for Miranda purposes, it is not necessary to consider whether the interview constituted "interrogation" within the meaning of Miranda.

**CONCLUSION**

For the reasons set forth above, Defendant Delvonte E. Harris' Motion to Suppress Statements, titled SUPPLEMENT TO DEFENDANT'S RESPONSE TO GOVERNMENT'S NOTICE OF INTENT TO INTRODUCE ALLEGED 404(b) EVIDENCE (ECF No. 29) shall be denied.

It is so ORDERED.

                     /s/     _REP_

Robert E. Payne
Senior United States District Judge


Richmond, Virginia
Date: December 15, 2015